UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELISSA BIVINS, ) | |
|     Plaintiff, ) | No. 13 C 8027 |
| ) | |
|     v. ) | Magistrate Judge Geraldine Soat Brown |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
|     Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Melissa Bivins brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying her application for Supplemental Security Income under the Social Security Act, 42 U.S.C. § 423. (Compl.) [Dkt 1.] Plaintiff moved for summary judgment [dkt 14] and filed a supporting memorandum (Pl.'s Mem.) [dkt 15]. The Commissioner filed a cross-motion for summary judgment [dkt 19] with a memorandum in support (Def.'s Mem.) [dkt 20]. Plaintiff replied. (Pl.'s Reply.) [Dkt 21.] The parties consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 5.] For the reasons set forth below, Plaintiff's motion is granted and the Commissioner's motion is denied.

## PROCEDURAL HISTORY

Plaintiff first applied for benefits in November 2010, and the agency denied her claim

initially and on reconsideration. (R. 59-60, 130.)[1] Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") and represented herself at the hearing held in April 2012. (R. 36.) In September 2012, the ALJ denied Plaintiff's request for benefits. (R. 17-29.) Because the Appeals Council declined Plaintiff's request for review (R.1-3), the ALJ's decision is the final decision of the Commissioner. *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## BACKGROUND

Plaintiff was 23 years old when she applied for benefits on the basis that she had become disabled by bipolar disorder in July 2010. (R. 130, 152.) She attended school through the eighth grade. (R. 153.) She was employed in short-term stints as a waitress, retail associate, and cashier before applying for benefits. (*Id.*)

**Medical History Before Hearing**

In October 2002, eight years before the alleged onset of her disability, Plaintiff was hospitalized for a week after "having aggressive outbursts at home and exhibiting out of control behavior." (R. 320.) She was 15 years old. (*Id.*) Dr. Sidney Moragne diagnosed her with post-traumatic stress disorder and depression, explaining that she was a "chronic run away" who had "a history of being physically abused by her mother and a history of being sexually abused while on the run on two different occasions." (R. 319-20.) The doctor noted that Plaintiff denied using drugs or alcohol, but that her older brother has a substance-abuse problem. (R. 320.) During the same

---

[1] The ALJ's decision lists November 1, 2010 as the date Plaintiff applied for SSI, but the application itself says November 19, 2010. (R. 17, 130.)

hospitalization, however, Plaintiff admitted to a social worker that she had used marijuana, cocaine, and alcohol. (R. 335.) Under "medications and usage," the doctor listed an antidepressant. (R. 321.) He discharged Plaintiff to her home and said that she would return to school. (R. 322.)

Six years later, in May 2008, Dr. Jeffrey Tilkin and Dr. Bruce McNulty evaluated Plaintiff, then age 20, when police brought her to the emergency room at Swedish Covenant Hospital after she got into a violent fight with her parents. (R. 341-47.) She admitted to drinking alcohol and smoking one pack of cigarettes per day, and she smelled of alcohol. (R. 341, 346.) Dr. McNulty diagnosed her with alcohol abuse and behavior disorder. (R. 341.) Dr. Tilkin diagnosed her with recurrent major depression, intermittent explosive disorder, alcohol abuse, and nicotine dependence, and prescribed her an antidepressant. (R. 347.) Dr. Tilkin also noted that she had previously been prescribed the same medication but that her brother had taken all of it. (R. 346.)

In May 2010, psychologist Stephan Romm began treating Plaintiff. (R. 396, 400.) He noted that she "gets angry very easily and overreacts to little things, then when she crashes, she cries." (R. 400.) She admitted to using alcohol daily, cocaine four times per week, and marijuana once per week "all except when pregnant until this year." (R. 401.) She also was irritated, agitated, and had lost weight. (R. 400.) Plaintiff's alleged disability began within two months of this visit. (R. 130.)

In January 2011, both Plaintiff and a friend of Plaintiff completed function reports describing her limitations. (R. 167-82.) Plaintiff's friend commented that she responds in a "very negative" or "aggressive" way when told what to do. (R. 167.) He noted, however, that she cares for her son by cleaning and feeding him. (R. 168.) He said that Plaintiff is very smart but that she was not doing well in her current living condition and could use help. (R. 174.) Plaintiff confirmed her friend's account that she feeds and bathes her son, but also stated that she was always tired, had

3

mood swings and panic attacks, and had trouble remembering when to take her medications. (R. 175-77.)

Plaintiff also visited a doctor in January 2011 with complaints of panic attacks occurring one to two times per day. (R. 431.) A doctor assessed her as having panic attacks "superimposed on bipolar" disorder. (*Id.*) She refused outpatient treatment. (*Id.*) The doctor ordered the level of her thyroid stimulating hormone tested, and it was found to be low. (*Id.*) She was discharged the same day with a prescription for Xanax for her anxiety. (R. 365, 431.)

In February 2011, psychologist Roberta Stahnke evaluated Plaintiff in relation to her application for benefits. (R. 358-62.) Plaintiff told Dr. Stahnke that her panic attacks had decreased from two to three times daily to about once or twice a week, but that an attack can last up to 45 minutes. (R. 359.) She said that she takes care of her son during the day, but that she sleeps up to 12 hours or more per day and other people watch her son during that time. (R. 359-60.) Dr. Stahnke noted that Plaintiff "reportedly raises [her son] herself but she is obviously getting help from her friend and from other members of his household." (R. 360.) Plaintiff also said that she quit drinking alcohol one year earlier and quit using marijuna and cocaine before that. (*Id.*) She reported Xanax as her only medication and told Dr. Stahnke that "it works for controlling her anxiety and panic." (R. 359.) Dr. Stahnke diagnosed Plaintiff with bipolar disorder and panic disorder, and opined that her substance-abuse problems were "in full sustained remission." (R. 361.)

In March 2011, a state-agency physician, Dr. David Gilliland, reviewed Plaintiff's medical records and assessed her limitations. (R. 380-83.) He concluded that she had "no significant mental limitations in ability to understand, remember, and carry out simple instructions" and was "mentally capable of performing simple repetitive tasks with limited contact with general public." (R. 382.)

Dr. Lionel Hudspeth affirmed that opinion in May 2011, concluding that there had been no significant medical changes in the meantime. (R. 386.)

In September 2011, Dr. Meredith Ulmer submitted a letter verifying that Plaintiff had been diagnosed with bipolar disorder in January of that year. (R. 387.) Dr. Ulmer also noted that Plaintiff was having "a very hard time retaining work" and that medical professionals were "currently working on pharmacological management of her condition." (*Id.*) Two days later, Dr. Ulmer saw Plaintiff for nausea and again assessed her bipolar disorder. (R. 421.) The doctor noted that Plaintiff reported her "worst symptoms [were] mood fluctuations and anxiety." (*Id.*) During the visit, Plaintiff's mood, thought content, cognition, and memory were all normal. (*Id.*) Dr. Ulmer prescribed Depakote for the bipolar disorder, noting that Plaintiff tried antidepressants when she was younger but they did not work at that time. (R. 421-22.) Four months later, in January 2012, Plaintiff told Dr. Ulmer that the depression and anxiety associated with her bipolar disorder were worsening and asked to increase her medication dosage. (R. 419.) Dr. Ulmer again observed that Plaintiff's mood, cognition, and memory were normal, but nonetheless doubled her dosage of Depakote (from 250mg to 500mg). (R. 420.)

In February 2012, Plaintiff returned to Dr. Romm, after not visiting him for one and a half years, on the recommendation of her primary care physician. (R. 390.)[2] She reported losing weight and waking up "several times a week from intense nightmares" related to her childhood trauma. (*Id.*) She said that Depakote reduced her anger and another medication, Buspirone, helped with her

---

[2] It is unclear from Dr. Romm's treatment note who sent Plaintiff for this visit, but it was likely Dr. Ulmer, whom Plaintiff refers to as her primary care physician. (Pl.'s Mem. at 4.)

5

anxiety, but that she was "noticing the sadness more" now that the anger was alleviated. (*Id.*)[3] A few weeks later, Dr. Romm laid out a plan to treat Plaintiff for post-traumatic stress disorder through "cognitive work and desensitization through retelling." (R. 389.)

On April 9, 2012 she visited Dr. Ulmer, who noted that Plaintiff's "[a]nxiety is daily and fluctuates from a feeling of general well being to near panic attacks." (R. 417.) On April 10, she was seen by Dr. Annabel Yuen after visiting the emergency room because her boyfriend had fractured her nasal bones. (R. 413.) She denied a history of substance abuse. (*Id.*) On April 16, Dr. Romm completed a brief psychological report about Plaintiff, stating that her current medications seemed to reduce her outbursts of anger and panic attacks, but that her "overall mood reactivity, anxiety and stress tolerance are still problems." (R. 388.) Dr. Romm also noted that Plaintiff reported "some difficulty with medication side effects and a change in the medication therapy may be required." (*Id.*) On May 8, 2012, shortly before Plaintiff's administrative hearing, Plaintiff spoke with Dr. Romm about working on anger related to her mother's criticism of her parenting. (R. 407.)

**Hearing**

In April 2012, Plaintiff represented herself at her hearing before the ALJ. (R. 37-51.) She said that she had to quit her last job, as a cashier at a bakery, because she "was having panic attacks in work" and "was getting very claustrophobic, uncomfortable." (R. 47.) She said that she was

---

[3] Depakote is a "trademark for a preparation of divalproex sodium," which is "used in the treatment of manic episodes associated with bipolar disorder and epileptic seizures, particularly absence seizures, and the prophylaxis of migraine." *Dorland's Illustrated Medical Dictionary* 490, 558 (32d ed. 2012) [hereinafter *Dorland's*]. Buspirone hydrochloride is "an antianxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms." *Id.* at 265.

living with her four-year-old son at a friend's parents' house, and that she takes care of her son "most of the time." (R. 49-50.) She also explained, however, that her son attends preschool and a friend drives him to school and back. (R. 42.)

Dr. Mark Oberlander then testified about his view of the medical evidence in the record. (R. 51.) Dr. Oberlander noted that he did not have access to any "treating source material" other than the September 2011 letter from Dr. Ulmer and the April 2012 letter from Dr. Rohm. (R. 51.) Given the material available, Dr. Oberlander said that he was "in relative agreement" with Dr. Gilliland, the agency reviewer. (R. 52.) Dr. Oberlander noted Plaintiff's hospitalizations in 2002 and 2008, but emphasized that she had a relatively high score of 70 out of 100 on the Global Assessment of Functioning test when released from her 2008 hospitalization. (R. 52-54.) He concluded that Plaintiff could perform simple repetitive routine work, but could not do work involving detailed complex instructions (because of her low education) and would need to work "where there was only occasional contact with coworkers, supervisors, and the public." (R. 54-55.) Plaintiff did not have any follow-up questions for Dr. Oberlander. (*Id.*)

After Dr. Oberlander testified, the ALJ asked a vocational expert ("VE") about Plaintiff's potential employment if "limited to simple repetitive routine work activities" and precluded from all but "limited contact with coworkers, supervisors and the public." (R. 57.) The VE answered that Plaintiff could work unskilled medium-exertion jobs such as a dishwasher or warehouser worker, or unskilled light-exertion jobs such as an electrical accessories assembler or hand packager. (R. 57-58.) The ALJ did not propose any additional hypotheticals to the VE.

7

**Medical Evidence After Hearing**

In May 2012, after the hearing but before the ALJ issued his opinion, Plaintiff visited Dr. Yuen and reported that she stopped taking her medication two weeks earlier because of side effects, including palpitations, dizziness, and increased anxiety. (R. 410.) Since that time, she found it hard to sleep because her mind raced and she had increased irritability and anxiety. (*Id.*) Plaintiff reported having panic attacks three to four times per day. (*Id.*) Dr. Yuen found Plaintiff's mood, affect, cognition, and memory normal, but concluded that she had "sleep disturbance and decreased concentration" and diagnosed her with mood disorder, anxiety, and depression with adverse medication effects. (R. 410-11.) The doctor started Plaintiff on Zyprexa, an antipsychotic, and directed her to follow up with Dr. Romm and Dr. Ulmer. (R. 411.)[4]

In July 2012, Dr. Romm submitted an additional assessment of Plaintiff's residual functional capacity ("RFC"). (R. 396-99.) He noted that he continued to treat Plaintiff with monthly cognitive behavior therapy and daily Zyprexa. (R. 396.) He opined that she would be unable "to function in a competitive work setting . . . on an eight-hour per day, five days per week, basis" because of post-traumatic stress disorder and bipolar disorder. (R. 396-97.) He explained that Plaintiff would be "off-task" more than 15% of the work day and would miss more than three days of work per month (the highest level on the assessment form). (R. 397.) He described Plaintiff's restrictions on "activities of daily living" as "mild," but her difficulties in maintaining "social functioning" and "concentration, persistence, or pace" as "marked." (R. 398.)

---

[4] Zyprexa is a "trademark for preparations of olanzapine," which is "a monoaminergic agent used as an antipsychotic in the management of schizophrenia and for short-term treatment of manic episodes in bipolar disorder." *Dorland's* at 1317, 2097.

8

**Disability Determination Process**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. Under the regulations, the Commissioner must consider: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four, and if that burden is met, at step five the burden shifts to the Commissioner to establish that the claimant is capable of performing work existing in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886.

**The ALJ's Decision**

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset of her disability. (R. 19.) At step two, the ALJ found that Plaintiff had six severe impairments: affective disorder, anxiety disorder, post-traumatic stress disorder, panic disorder, personality disorder, and a history of substance abuse. (*Id.*) At step three, the ALJ found that none of Plaintiff's impairments met or equaled the severity of any disability listing, including those covering affective, anxiety, and personality disorders (listings 12.04, 12.06, and 12.08). (R. 20-22.) At step four, the ALJ determined that Plaintiff had "the residual functional capacity to perform a full range of work at all exertional levels" but was "limited to simple, routine, and repetitive tasks" and "can have only occasional contact with coworkers, supervisors, and the public." (R. 22.) The ALJ also decided that Plaintiff had no past relevant work because none of her positions were performed at a level that qualified as substantial gainful activity. (R. 27.) Finally, at step five, the ALJ decided that, based on Plaintiff's age, education, work experience, and residual functional capacity, she could find work in one of the positions mentioned by the VE. (R. 28.)

In making his decision, the ALJ explained that he gave "little weight" to Dr. Romm's most-recent opinion because, in the ALJ's view, it was "inconsistent with the longitudinal medical evidence of record and [Dr. Romm's] own examination findings." (R. 25.) The ALJ did not say which particular evidence conflicted with Dr. Romm's assessment. The ALJ also decided that Dr. Ulmer's opinion from 2011 about Plaintiff having a hard time retaining work "to the extent that this statement represents an opinion of work-related functions . . . is inconsistent with the record as a whole." (*Id.*) The ALJ concluded that Dr. Oberlander's opinion was "the most informed, consistent with the medical evidence of record and consistent with the record as a whole." (R. 26.) The ALJ

also gave "some weight" to Dr. Gilliland's opinion from 2011 "as he has program familiarity and his opinion is consistent with the credible medical evidence of record." (R. 26.)

The ALJ also concluded that Plaintiff "was not fully credible as to the extent of her impairments." (R. 27.) The ALJ noted that Plaintiff said that "on a typical day she takes care of her son, cleans cooks, bathes, and watches movies," and that she has "no problems taking care of her own personal needs," including preparing meals, cleaning, washing and ironing laundry, and dusting. (*Id.*) Further, Plaintiff's friend stated that Plaintiff uses a computer and goes to the park with her son. (*Id.*, citing R. 168.) The ALJ also noted that "when the [Plaintiff] was compliant with medication, the medication was relatively effective in controlling her symptoms." (R. 27.) Finally, the ALJ noted that Plaintiff provided inconsistent information about the extent of her history with substance abuse. (*Id.*)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. *See* 42 U.S.C. § 405(g). Where the Appeals Council declines a requested review of an ALJ's decision, it constitutes the Commissioner's final decision. *Villano*, 556 F.3d at 561-62. While an ALJ's legal conclusions are reviewed *de novo*, her factual determinations are reviewed deferentially and are affirmed if they are supported by substantial evidence in the record. *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support the decision. *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673. "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support.

*Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors her ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634-35 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Although the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and logical bridge between the evidence and the conclusion so that a reviewing court may assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review. *Craft*, 539 F.3d at 673. "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

## DISCUSSION

Plaintiff argues that the ALJ erred by relying on Dr. Oberlander's opinion rather than Dr. Romm's, failing to adequately account for her limitations in concentration, persistence, and pace, and incorrectly assessing her credibility.

### 1. Dr. Oberlander and Dr. Romm

Plaintiff first argues that the ALJ was wrong to credit Dr. Oberlander's opinion over that of Dr. Romm, her treating psychologist. (Pl.'s Mem. at 7-10.) "A treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). Even if not giving the opinion controlling weight, the ALJ must give a sound explanation for rejecting a treating physician's opinion and adopting another doctor's

view. *Id.*; *see also Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013).

The ALJ's explanation for rejecting Dr. Romm's opinion was very limited. Without citing any specific evidence, the ALJ stated that Dr. Romm's opinion was "inconsistent with the longitudinal medical evidence of record and his own examination findings." (R. 25.) This vague, single-sentence explanation makes it very difficult to review the ALJ's decision. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele*, 290 F.3d at 940).

Despite the ALJ's limited explanation, the Commissioner attempts to defend the ALJ's analysis by noting that, elsewhere in his opinion, the ALJ discussed medical evidence that purportedly contradicts Dr. Romm's opinion. (Def.'s Mem. at 4-5.) The Commissioner specifically cites Dr. Ulmer's opinion from 2011, Dr. Yuen's assessment after the hearing, and Dr. Romm's notes about Plaintiff's condition being controlled with medication. (*Id.*)

The Commissioner's arguments fail for several reasons. First, the ALJ never explained why the evidence the Commissioner cites conflicts with Dr. Romm's assessment, and the court cannot consider rationale the ALJ did not embrace. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Steward v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009)("[I]n reviewing [the ALJ's RFC determination], a court must confine itself to the reasons supplied by the ALJ.")). Even if the court could consider that rationale, the Commissioner ignores key evidence supporting Dr. Romm's opinion. For example, the Commissioner points to Dr. Ulmer's observation in 2011 that Plaintiff had a normal mood and affect during her examination, but fails to mention that Dr. Ulmer also recorded "mood fluctuations" as one of Plaintiff's worst reported symptoms. (R. 421.) The Commissioner also says nothing about

13

Dr. Ulmer's treatment notes showing that Plaintiff reported her anxiety was worsening in January 2012 and that by April she was experiencing daily anxiety fluctuating between a normal mood and near panic attacks. (R. 417-20.) The Commissioner further points to Dr. Yuen's opinion in 2012 that Plaintiff had normal mood, affect, and behavior, without mentioning that Dr. Yuen also recorded that Plaintiff was having panic attacks up to four times per day and had stopped her medications because of side effects. (R. 410.) To ignore those pieces of these medical records and focus only on the plaintiff's mood and affect during the examinations themselves fails to consider the fluctuations people with mental disorders may experience. *See e.g.*, *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (discussing that because of the fluctuating nature of bipolar disorder, a single notation that a patient has a good day does not imply the condition has been treated).

The Commissioner's argument that Dr. Romm's treatment notes show that Plaintiff's condition was controlled with medication also does not hold up under scrutiny. According to the Commissioner, Dr. Romm stated in April 2012 that "medications controlled [Plaintiff's] anger outbursts and panic attacks." (Def.'s Mem. at 5, citing R. 388.) Dr. Romm actually wrote, however, that her outbursts and attacks "seem reduced" on her medication, but "[h]er overall mood reactivity, anxiety and stress tolerance are still problems" and she reported "some difficulty with medication side effects and a change in the medication therapy may be required." (R. 388.) This final concern came to fruition a month later when, as Dr. Ulmer noted, Plaintiff stopped her medications because of the side effects and experienced an increase in anxiety problems. (R. 410.) Those notes support Dr. Romm's opinion that Plaintiff's mood swings and anxiety attacks would affect her ability to function in a work setting. Therefore, even assuming the ALJ took the evidence cited by the Commissioner into account when commenting that Dr. Romm's opinion conflicted with his

14

examination findings, the record does not support that proposition.

Even more troubling is the ALJ's remark that Dr. Oberlander's opinion was "the most informed" in the record. (R. 26.) Doctor Oberlander did not treat or examine Plaintiff outside her hearing and conceded that he did not have access to large portions of the medical evidence, including Dr. Ulmer's treatment notes, which were submitted after the hearing. (R. 51-52.) There is no indication that this information or Dr. Romm's post-hearing assessment were ever sent to Dr. Oberlander as a follow up. The ALJ has a duty to develop a full and fair record, and that duty is enhanced when, as here, a claimant appears pro se. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997). Additionally, as Plaintiff points out, most of Dr. Oberlander's comments addressed Plaintiff's hospitalizations in 2002 and 2008, before the alleged onset of her disability. (*See* R. 52-55.) The record does not support the ALJ's decision that Dr. Oberlander was the most informed about Plaintiff's condition. For that reason, and the others discussed above, the ALJ did not support his decision to reject Dr. Romm's opinion in favor of Dr. Oberlander, and remand is necessary on this issue.

**2.      Limits in Concentration, Persistence, and Pace**

Plaintiff next argues that the ALJ erred in using the phrase "simple, routine and repetitive tasks" in the RFC and hypothetical posed to the VE because it is ambiguous and understates her difficulties in concentration, persistence, and pace. (Pl.'s Mem. at 10-11.) Plaintiff points out the ALJ failed to heed the Seventh Circuit's advice in *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010), that "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these

limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." The court further explained the pitfalls of ambiguous terminology:

> In most cases, . . . employing terms like "simple, repetitive tasks" on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace. The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity.

*Id.* at 620 (citations omitted); *see also Yurt v. Colvin*, 758 F.3d 850, 857-59 (7th Cir. 2014) (remanding when the ALJ's hypothetical to the VE did not adequately account for plaintiff's limitations in concentration, persistence, and pace). In response, the Commissioner emphasizes that the Seventh Circuit also observed that there is no "per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases," and the court has sometimes "assumed a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations." *O'Connor-Spinner*, 627 F.3d at 619.

The ALJ's hypothetical here may initially appear to fall under the exception recognized in *O'Conner-Spinner* for instances when the VE listened to the hearing testimony and reviewed the available medical records. *Id*. As explained earlier, however, the record developed at the hearing, where Plaintiff represented herself pro se, did not contain important information about Plaintiff's limitations, including Dr. Ulmer's treatment notes from 2012 indicating Plaintiff's worsening daily anxiety, Dr. Yuen's notes from May 2012 about the effects of the discontinuance of Plaintiff's medications, and Dr. Romm's assessment from July 2012 concluding that Plaintiff had marked difficulties in maintaining concentration, persistence, or pace. Those omissions undermine the court's ability to assume the VE's familiarity with Plaintiff's limitations.

In any event, the court need not decide whether the ALJ's hypothetical, on its own, constituted reversible error because the ALJ's other errors require remand. On remand, the ALJ should heed the advice in *O'Connor-Spinner* and *Yurt* and refer expressly to Plaintiff's limitations on concentration, persistence, and pace.

**3.     Plaintiff's Credibility**

Finally, Plaintiff challenges the ALJ's conclusion that she was not credible. (Pl.'s Mem. at 11-14.) "The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). The court will "reverse credibility determinations only if they are patently wrong." *Id.* To show that the determination was patently wrong, Plaintiff "must do more than point to a different conclusion that the ALJ could have reached." *Id.* at 1162.

In her effort to surmount this burden, Plaintiff accuses the ALJ of impermissibly ignoring evidence that undermined his opinion. (Pl.'s Mem. 12-14.) "[A]lthough an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). An ALJ's failure to confront conflicting evidence is enough to warrant remand of a credibility determination. *See Moore*, 743 F.3d at 1123; *Terry v. Astrue*, 580 F.3d 471, 477-78 (7th Cir. 2009); *Ribaudo v. Barnhart*, 458 F.3d 580, 584-85 (7th Cir. 2006).

The court agrees with Plaintiff that the ALJ overlooked evidence in her favor. First, the ALJ emphasized Plaintiff's ability to care for her young child, "without any particular assistance," citing the function reports Plaintiff and her friend completed in 2011. (R. 27.) The ALJ failed to mention,

17

however, Dr. Stahnke's remark that Plaintiff "reportedly raises [her son] herself but she is obviously getting help from her friend and from other members of his household" (R. 360), or Plaintiff's testimony at her hearing that her son now attends preschool and a friend drives him there (R. 42). Further, as part of the ALJ's credibility finding, he asserted that Plaintiff's medications, when she took them, were "relatively effective in controlling her symptoms." (R. 27.) But the ALJ did not acknowledge evidence that Plaintiff had trouble remembering to take her medication and that she experienced an upsurge in panic attacks in 2012 after she stopped taking her medications because of the side effects. (R. 177, 410.) The Seventh Circuit has criticized ALJs for ignoring similar evidence, admonishing that "antidepressant drugs often produce serious side effects that make patients reluctant to take them" and that "people with serious psychiatric problems are often incapable of taking their prescribed medications consistently." *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (citing *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010)). The ALJ's decision to discredit Plaintiff based on her care for her son and medications cannot stand given the errors in the ALJ's analysis.

The ALJ gave one final reason for discrediting Plaintiff: that she denied a history of substance abuse. (R. 27, citing R. 413.) The only occasion the ALJ cited was Plaintiff's denial of her history during what appears to be her first visit with Dr. Yuen, when following up about continuing pain and bleeding in her nose after her boyfriend broke it in 2012. (R. 413.) The ALJ did not mention it, but Plaintiff also initially denied using drugs and alcohol when hospitalized at age 15. (R. 320.) Aside from those incidents, the record shows that Plaintiff repeatedly admitted her history of drug and alcohol abuse, first to her medical providers, then to the ALJ at her hearing (though she was sometimes inconsistent in describing when she stopped). (R. 46-47, 335, 360, 401.)

It is unclear whether the ALJ would have discredited Plaintiff based on her denial of substance-abuse to Dr. Yuen if the ALJ had explicitly considered the evidence just discussed. Therefore, the ALJ should reconsider his credibility decision on remand in light of this opinion.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [dkt 14] is granted, and the Commissioner's cross-motion for summary judgment is denied [dkt 19]. The case is remanded pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. Judgement is entered for the Plaintiff and against the Commissioner.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: May 26, 2015